**EXHIBIT B**

November 19, 1999


Dirk Durstein
Heckler & Cattie, Esqs.
919 North Market Street
Wilmington, Delaware 19897


Re:    Charles A. Brown v. Cathedral Community Services
       File # 07a00109

Dear Mr. Dirstein:

This follows my fax to Barry Heckler of yesterday.  Here is the hard copy of our file.  We provide $1,000,000 limit liability coverage to Cathedral Community Services for its properties, including the loss location.  We have limited investigation.  Feel free to utilize Crawford & Company's services further – or if this is a little too technical for them – hire your own investigator.

Unfortunately, the insured cannot locate the contract between itself and the codefendant, Capital Management Company.  Please answer only for Cathedral Community Services.  Should you need quick assistance, the chancellor for the Episcopal Diocese of Delaware, Don Taylor, may be contacted.  I believe you know Don.

Kindly report to the undersigned only.

Very truly yours,

1

**Mike Lindgren**
**Sr. Claims Supervisor**

# COOCH AND TAYLOR

ATTORNEYS AT LAW

SUITE 1000

824 MARKET STREET MALL

P.O. Box 1680

WILMINGTON, DELAWARE 19899-1680

FAX (302) 652-5379

(302) 652-3641

DONALD C. TAYLOR
H. ALFRED TARRANT, JR.
ROBERT W. CROWE
BONNIE H. SHEER
W. JEFFREY WHITTLE*
MICHAEL A. FRIEDBERG**
JEOFFREY L. BURTCH
C. SCOTT REESE
ANDREW P. TAYLOR*
THOMAS D. SHELLENBERGER
PAULA C. WITHEROW*
NANCY N. DOUGHTEN***
MARY ANN P. BAZZANO*
GREGORY J. WEINIG*
ADAM SINGER+

*ALSO ADMITTED IN PA
**ALSO ADMITTED IN PA AND VA
***ALSO ADMITTED IN PA AND CT
+ALSO ADMITTED IN MA AND NY

OF COUNSEL
EDWARD W. COOCH, JR.

SPECIAL COUNSEL
STEVEN H. AMICK

NEWARK OFFICE
STEVEN H. AMICK
51 EAST MAIN STREET
NEWARK, DELAWARE 19711
FAX (302) 366-7491
(302) 366-7200

KENNETT SQUARE OFFICE
MARY ANN P. BAZZANO*
RESIDENT ATTORNEY
502 WEST CYPRESS STREET
KENNETT SQUARE, PENNSYLVANIA 19348
FAX (610) 444-5446
(610) 444-5700

November 22, 1999

Ralph K. Durstein, III, Esquire
Heckler & Cattie
1300 Mellon Bank Center
919 N. Market Street
Wilmington, DE 19801

HAND DELIVER

Re:    Cathedral Community Services, Inc.
       Our File No. LT99/120 (#19928.1)

Dear Durk:

I am enclosing herewith a copy of the Property Management Agreement between Cathedral Community Services, Inc. and Capital Management Company.

As I mentioned in my phone message, there are sections of the Agreement which specify that it is the Manager's responsibility, at Owner's expense, to maintain the project in good repair and to make inspections, etc. In addition, there are sections having to do with indemnification.

If there is anything further which I can provide for you, please advise me and I shall attempt to follow through promptly for you.

3

**Cathedral Community Services**
**Board of Directors Meeting**
**November 23, 1999**

<u>Board Members Present:</u> Bob Chandler, Patricia Debnam, Matt Shipp, Suzy Veasey.

<u>Staff Present:</u> Dean Peggy Patterson, Reverend Lois Keen, Reverend Kenneth Phillips

<u>Guests:</u> Gary Hayman-Capital Management, Angelo Zenorini.

I.      Peggy Patterson opened the meeting with prayer.

II.     The minutes from the last meeting on September 21 were accepted as written.

III.    <u>Financial Report</u>-Matt Shipp stated that there would be no report available until the new financial software is installed and running. Bob Martz and the new bookkeeper are working on the new system and it will be able to report our finances as required.

IV.    <u>Rental Properties</u>-Bob Chandler reported that seven of the eight apartments are now rented, though a court action was filed against Antonio DeJesus (2005 N. Market Street 3rd Floor) for back rent in the amount of $826. He promptly paid $350 and will seek help from several social service agencies for assistance with the balance. Capital Management may file for possession if no funds are forthcoming by the end of the appeal period on 11/24/99. The 3- bedroom apartment at 2009 N. Market St. (over the Next to New Shop) is the one remaining vacant unit. Refurbishing has been delayed due to the leaking roof over the bathroom and kitchen. A contractor has been selected for the roof repairs and as soon as these are made, the unit will be made ready for rental including a new kitchen floor and new carpeting. Applicants are being interviewed.

Several complaints were received about the lack of acceptable heat in the apartments above the Brandywine Food Market. This problem has been traced to the tenant in the Market adjusting the thermostat to suit them. This single control also determines the heat flowing to the 3 apartments above the store. Alan Marine Plumbing and Heating has submitted a proposal to install a separate thermostat for Brandywine Market, which has been approved. Complaints continue to be received about the stale foods from the Market. It was also mentioned that the Market has broken its lease by refusing to remove the cigarette ads in the windows, after numerous requests by members of this Committee. It was suggested that the time may have arrived when we should evict the Market and find a more cooperative, acceptable tenant. Angelo Zenorini reported a $49.00 bill for electricity for the garage and apartment on

W. 20th Street. The bill appears higher than expected for this address, assuming the tenant is paying her own electric bill. Bob Chandler will check this out with Conectiv Power.

V.   **Parking Lot Rentals**-Angelo Zenorini reported that he was attempting to track down the status of the 17 people renting parking spaces, but several have not been found as yet. He is setting up a lease agreement that will include pertinent data on the tenant including the home address and license number. He is also designing a tag that will be required to be displayed.

Peggy Patterson said she was embarrassed that the Diocese was paying for eight parking spaces that they seldom fill up. In as much as we have a close, cooperative relationship with the Diocese, she proposed that the spaces be offered without rent henceforth. Matt Shipp will poll the remaining board members to get a majority of members in favor of the proposal. It was also suggested that Piane's Caterers, who park their truck(s) in the lot, be approached to ask for an "in-kind" payment or a $35/month credit towards catered events at the Cathedral. This proposal met with the board's approval.

VI.   **Next To New Shop**-Report submitted by Marion Allison following the meeting.

1.   Total sales for September thru October 1999        $7123.80

2.   Total assets as of October 31, 1999            $51,721.66

3.   Grants for September thru October:

| | |
|---|---|
| Assistant Clergy Expense Fund | $300.00 |
| St. Andrews Breakfast | 55.79 |
| Choir Uniform Fund | $300.00 |
| | $655.79 |

4.   Next To New management            $2435.91
     Management Health Comp.            $ 131.92

VII.   **Capital Management**-Gary Hayman began by saying that we now have a group of tenants who are keeping current with their rent and are an improvement over past tenants. In answer to questions regarding the proper disposal of trash, he said the tenant responsibility is covered in the lease. Also, tenants can and will be billed for extra maintenance costs which are due to their negligence (i.e. stopped-up toilet in 2005 N. Market St. when the tenant's son dropped a toy into the bowl, which required a plumbing call). Gary suggested we might want to consider a Tenant Association to develop a sense of community among our tenants. He also suggested we might apply for a grant from the Delaware State Housing Authority for exterior

renovations, which would be in line with the objectives of the Brandywine Village Association. Gary then indicated he would be amenable to take over all of the CCS properties including the Brandywine Food Market and Next-To-New Shop, and that he would need to add an office management fee of $350/month to cover the extra expense incurred. In addition, a fee of ½ month's rent would be charged for each new rental obtained. He presented a copy of the new agreement, for our consideration, that would begin on November 30, 1999. Under the new contract, all maintenance would be handled through Capital Management's office so that the Cathedral office would no longer be required or expected to field these calls. It was apparent that Gary continues to be sympathetic and supportive of the outreach goals we have and his willing participation in assisting us in the future.

VIII.   **Study of Potential Options for Rental Properties**-The Dean recommended that a committee be formed of CCS, Inc., and Cathedral members to consider the potential options we have for use of the rental properties in the future. She suggested the possibility of business offices of social agencies, non-profit agencies, and/or private businesses. She believes we need to have an attractive group of properties in the close proximity to the Debnam House and not be considered a "slum lord" of the neighborhood.

IX.   **Lawsuit from Fire Escape Accident**-A suit has been filed against the Cathedral and CCS, Inc., in the name of Charles Brown who was injured when he attempted to pull down the fire escape ladder at 1 West 20th St. to gain access to the second-floor apartment in late August 1999.

X.   **Next Meeting**-The next meeting is scheduled for Tuesday, February 15 at 7:30 p.m.

XI.   Lois Keen concluded the meeting with prayer.

Submitted by
Bob Chandler
Secretary

6

To:    Ralph K. Durstein, III, Esquire
Date:  November 22, 1999
Page:  2


I am extremely pleased that you are the attorney working on this matter.

Sincerely yours,

Donald C. Taylor

DCT/hlm
Enclosures
cc:    The Rt. Rev. Wayne P. Wright
       Dean Peggy Patterson
       Ms. Judith A. Viar
       Mr. Michael Lindgren

7

## PROPERTY MANAGEMENT AGREEMENT

RECEIVED
NOV 22 1999
H F & D.,

THIS AGREEMENT, effective as of the ___1ST___ day of ___June___, 1994, is between Cathedral Community Services, Inc. _____ (the "Owner"), and Capital Management Company _____ (the "Manager").

### RECITALS:

WHEREAS, Owner owns certain improved real properties listed in Exhibit A (hereinafter collectively referred to as the "Project"); and

WHEREAS, Owner wishes to obtain the services of Manager in connection with the operation, direction, management, maintenance, supervision and rental of the "Project", subject to the terms and provisions of this Agreement; and Manager wishes to perform such services in exchange for the fee provided herein;

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, the parties hereto agree as follows:

### ARTICLE I
### ENGAGEMENT

1.1  Engagement.  Owner hereby engages Manager to manage, operate, maintain and be responsible for renting apartments and office units in the Project in accordance with the terms of this Agreement.

### ARTICLE 2
### TERM

2.1  Term.  This agreement shall become effective on the date hereof, and shall continue in full force and effect until May 31, 1995, unless sooner terminated in accordance with the conditions of this Agreement.

### ARTICLE 3
### SERVICES OF MANAGER

3.1  Standard of Conduct.  Manager shall hire and manage as its own employees all personnel necessary to operate and maintain the Project in a manner normally associated with the management and operation of low income housing and real property and subject to approval of Owner.

3.2  Collection of Rents and Other Receipts.  Manager shall use diligent efforts to collect, when due, all rents, charges and other accounts receivable on Owner's account in connection with rental of the Project.  All monies so collected shall not be commingled with other funds and shall be deposited in Projects Account in accordance with the provisions of Article 7.

8

3.3  **Rentals.**  Manager shall offer the housing units in the Project for rent.  Pursuant to its rental responsibilities, Manager shall:

(a)  prepare the Project for initial rent-up to begin as the rehabilitation of the Project is completed during 1988;

(b)  develop for Owner's approval, rules and regulations for management of the Project in keeping with Owner's obligation contained in Project loan agreements;

(c)  develop for Owner's approval, a tenant lease form;

(d)  collect, deposit in a separate account for Owner and disburse security deposits in accordance with each tenant's lease and Delaware Law; and

(e)  perform andy and all other responsibilities as may be mutually agreed upon, for a pre-determined fee

3.4  **Qualified Rental Use.**

(a)  **HUD Requirements.**  In futherance of Owner's business purposes, Manager shall rent the housing units in the Project only to individuals or families who quality under the guidelines established by the Secretary of the United States Department of Housing and Urban Development as "low or moderate income" families, with a primary objective of having a substantial portion of the Project occupied by "very low-income" individuals or families, to be used exclusively by all such persons as their principal personal residences. However, occupancy of the Project by families or individuals who at the time of initial occupancy meet the income guidelines for "very low-income" and "low and moderate income" individuals and families but who subsequently exceed such guidelines shall not violate this agreement.  Manager shall in renting units obtain credit and character references and perform such checking as is customary in residential real estate management.

(b)  **Low Income Housing Credit Requirements.**  Managr shall ensure that throughout the term of this Agreement, the tenants in all housing units in the Project meet the requirements of the low income housing creditunder Section 42 of the Internal Revenue Code and any Treasury Regulations promulgated theraunder, including, but not limited to, the following requirements:

(i)  the gross rent (including all utilities, but excluding HUD Section 8 or other rental assistance payments) for each housing unit may not exceed 30% of the qualifying income level for the Tenant selected under (i) above.

3.5  **Enforcement of Leases.**  Manager shall secure full compliance by each tenant with the terms of his lease.  Voluntary compliance will be emphasized and Manager shall counsel tenants and make referrals to commmity agencies in cases of financial hardship or under other circumstances deemed appropriate by Manager, to the end that involuntary termination of tenancies may be avoided to the maximum extent consistent with sound management of the Project.  Nevertheless, Manager may lawfully terminate any tanancy when, in Manager's judgment, sufficient cause for such termination occurs under the terms of tenant's lease.  Manager shall report to Owner monthly on all tenants who are 30 days delinquant in

payment of rent.

3.6  Maintenance and Repair.  Manager shall, at Owner's expense, maintain the Project in good repair in accordance with the Project rules and regulations, local codes, and with Owner's mortgage loan documents and in a condition at all times acceptable to Owner, including but not limited to cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary.  Incident thereto, the following provisions shall apply:

(a)  Manager shall systematically and promptly receive and investigate all service requests from tenants, take such action thereon as may be justified, and shall keep records of the same.  Complaints of a serious nature shall be reported to Owner after investigation by Manager.

(b)  Except as otherwise provided in this section, Manager is authorized to purchase, at Owner's expense, all materials, equipment, tools, appliances, supplies and services necessary to proper maintenance and repair of the Project.

(i)  The prior approval of Owner will be required for any expenditure which exceeds Five Hundred Dollars ($500.00) in any one instance for labor, materials, or otherwise in connection with the maintenance and repair of the Project, except (A) for emergency repairs involving manifest danger to persons or property, or required to avoid suspension of any necessary service to the Project, in which event Manager shall inform Owner of the facts as promptly as possible, or (B) itemized budget expenditures and recurring expenses within the limits of the operating budget.

(ii)  The prior approval of Owner will be required to enter into a contract that is to exceed one year in duration or that calls for unbudgeted aggregate expenditures in excess of Five Hundred Dollars ($500.00) annually.  Manager shall report to Owner all contracts budgeted or unbudgeted in excess of $1,500.00.

(c)  Manager shall physically inspect each dwelling unit prior to commencement of occupancy by any tenant and at least annually thereafter.

3.7  Utilities and Services.  Manager shall make arrangements for water, electricity, gas, fuel, oil, sewage and trash disposal, vermin extermination, decoration of common areas, and laundry facilities.  Subject to Owner's prior approval as required in Section 3.6, Manager shall make such contracts as may be necessary to secure such utilities and services.

3.8  Taxes and Assessments.  Manager shall obtain, verify and pay or cause to be paid at Owner's expense all bills for real estate and personal property taxes, improvement assessments and other like charges which are or may become liens against any portion of the Project.  Manager shall promptly

10

## ARTICLE 5
### INSURANCE AND INDEMNIFICATION

5.1 <u>Coverage</u>. Manager shall, upon written request, obtain in Owner's name and at Owner's expense and keep in force, in an amount requested by Owner, insurance against physical damage (e.g., fire and extended coverage endorsement, boiler and machinery, etc.) and against liability for loss, damage or injury to property or persons which might arise out of the occupancy, management, operation or maintenance of any part of the Project. [Manager shall be named as an additional insured in all liability insurance maintained with respect to the Project.] Owner shall save Manager harmless from any liability on account for loss, damage or injury in connection with the performance of Manager's duties hereunder. Nothing herein shall be construed as indemnifying Manager against gross negligence on the part of Manager or its employees, contractors or agents. The foregoing is also not intended to affect the general requirement of this Agreement that the Project shall be managed, operated and maintained in a safe condition and in a proper and careful manner.

5.2 <u>Cooperation</u>. Manager shall furnish whatever readily available information is requested by Owner for the purpose of obtaining coverage and shall aid and cooperate in every reasonable way with respect to such insurance and any loss thereunder.

5.3 <u>Manager's Insurance</u>. At all times during the term of this agreement, Manager shall maintain insurance in full force and effect, with a responsibile insurance company reasonably satisfactory to Owner and to Owner's mortgage lenders who is licensed to do business in Delaware and shall furnish Owner with a certificate of insurance evidencing workers' compensation insurance, in such amounts as may be required by law upon request. Such certificate shall have attached thereto endorsements that give at least thirty days' prior written notice of cancellation of or any material change in policy.

5.4 <u>Subcontractor's Insurance</u>. Manager shall require that all sub-contractors working on the Project maintain, at the subcontractor's expense, worker's compensation insurance, in such amounts as may be required by law from time to time. Manager shall obtain Owner's permission to waive any of the require-ments in this Section 5.4.

5.5 <u>Indemnification of Owner</u>. Manager shall indemnify and hold Owner harmless from and against any and all claims, causes of action, liabilities, damages, losses, costs, judgments and expenses (including reasonable attorney's fees) of any kind or nature whatsoever, arising out of the gross negligence of Manager, its employees of agents in connection with the services of Manager required or in fact performed hereunder or otherwise relating to the Project.

5.6 <u>Indemnification of Manager</u>. Owner shall indemnify and hold Manager harmless from and against any and all claims, causes of action, liabilities, damages, losses, costs, judgments and expenses (including reasonable attorney's fees) of any kind or nature whatsoever, arising out of the willful misconduct or negligence of Owner, its employees or agents, or otherwise arising in con-nection with the ownership of the Project.

11

5.7  Survival of Indemnity Obligations.  The indemnity obligations contained in this Agreement shall survive the termination of this Agreement.

## ARTICLE  6
### OWNER'S RIGHT TO AUDIT

6.1  Owner's Right to Audit.  Owner reserves the right to conduct or to appoint others to conduct  examination, at Owner's expense, with notification, of the books and records maintained for Owner by Manager and to perform any and all additional audits relating to Manager's activities hereunder.

6.2  Correction of Discrepancies.  Should Owner's employees or appointees discover errors in record keeping, Manager shall correct such discrepancies within a reasonable period of time.  Manager shall inform Owner in writing of the action taken to correct such audit discrepancies.

## ARTICLE  7
### REMITTANCE OF FUNDS

7.1  Deposit of Funds.  Manager shall deposit upon receipt all security deposits in a separate account for Owner and shall deposit all rents and other funds  collected from the operation of the Project, including any and all advance funds, in a bank approved by Owner, in Owner's account for the Project in the name of:                                      ("Owner's Account").

7.2  Security Deposits.  Manager shall maintain detailed records of all security deposits and such records shall be open for inspection by Owner's employees or appointees.

7.3.  Expenditures.  Any disbursements made by Manager pursuant to this Agreement shall be made out of Owner's Account.  Owner agrees to make necessary operating funds available to Manager.  Manager shall not be obligated to make any advance to Owner's Account or to pay any amount except out of funds in Owner's Account, no  shall Manager be obligated to incur any extraordinary liability or obligation unless Owner shall furnish Manager with the necessary funds for the discharge thereof.  If Manager shall voluntarily advance for the Owner's Account any amount for the payment of any obligation or necessary expense connected with the maintenance or operation of the Project or otherwise, Owner shall reimburse Manager immediately upon demand.

## ARTICLE 8
### COMPENSATION

The Manager will be compensated for its services under this agreement by monthly fees, to be paid out of the Operating Account and treated as Project expenses .  Such fees will be payable on the first day of each month.  Each monthly fee will be a sum equal to 8 percent of gross rental income for the preceding month.  In addition, the Manager shall also receive an incentive management fee of 10% up to $10,000.00 per year to the extent operating revenues exceed operating expenses (including payment of all interest due under the Owner's mortgage loan obligation) by $500.00.  Any deferral of some or all of

Manager's ten (10) percent fee shall bear interest at 10 percent per annum and shall be payable out of future budgets and other resources of Owner.

## ARTICLE 9
### TERMINATION

9.1  Sale of Property.  This Agreement upon adequate written notice and mutual assent shall be terminated automatically and immediately upon destruction, condemnation, sale, exchange or other disposition (excluding any mortgage) of the Project by Owner.

9.2.  Other Termination.  This Agreement may be terminated by either party at any time, with or without cause, upon adequate notice, giving 30 days written * notice of intent to terminate to the other party.  This Agreement will also terminate in the manner set forth below upon the occurrence of any of the following circumstances which shall be considered a default.

*NOTE
Thirty (30)
shall begin
the first
day of the month.

(a)  The filing of a voluntary petition of bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by either Owner or Manager.

(b)  The consent to an involuntary petition in bankruptcy or the failure by either Owner or Manager to vacate with 90 days from the date of entry thereof any order approving an involuntary petition.

(c)  The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating either Owner or Manager a bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree shall continue unstayed and in effect for a period of 120 consecutive days.

(d)  The material failure of either Owner or Manager to perform, keep or fulfill any of the covenants, undertaken, obligations or conditions set forth in this agreement, and the continuance of any such default for a period of 30 days after notice of such failure.

Upon any such event of default, all outstanding debts owed to Manager become immediately due and the non-defaulting party may without prejudice to any other recourse at law which it may have, give to the defaulting party notice of its intention to terminate this Agreement and the term of this Agreement shall expire.

send to Owner all notices of assessment or reassessment and tax bills affecting the Project. Owner reserves the right to control all tax appeals. Manager shall take full advantage of all discounts available in connection with the payment of real and personal property taxes.

3.9 <u>Licenses and Permits</u>. Manager shall acquire and keep in force at Owner's expense all licenses and permits required for the operation of the Project as rental housing.

3.10 <u>Property Inspection</u>. Manager shall conduct regular comprehensive inspections of the Project at least annually and provide Owner with a written report on its findings. Manager shall promptly notify Owner of any condition in the Project requiring the attention of Owner.

3.11 <u>Maintenance of Records</u>. Manager shall maintain complete and identifiable records and files on all matters pertaining to the Project, such records shall be available for Owners inspection upon request.

3.12 <u>Tenant-Management Relations</u>. Manager shall encourage and assist tenants of the Project to participate in a residents' organization to promote the tenants' common interests and to increase their ability and incentive to protect and maintain the Project and to contribute to its efficient management.

3.13 <u>Owner Communications</u>. Manager sahll be available for communications with Owner and shall keep Owner advised of items materially affecting the Project.

3.14. <u>Financial Reporting and Record Keeping</u>.

(a) Manager shall maintain adequate and separate books and records for the Project, which shall be supported by sufficient documentation to ascertain that all entries are properly and accurately recorded. Such books and records shall be maintained by Manager at Manager's principal office or at such other location as Manager and Owner may agree upon in writing. Manager shall ensure such control over accounting and financial transactions as is reasonably required to protect Owner's assets from theft, error or fradulent activity.

(b) <u>By the fifth day of the following month.</u> Manager shall furnish Owner statements of receipts and disbursements during the previous month. Manager shall prepare <u>quarterly</u> reports comparing actual and budgeted figures for disbursement and receipts. These reports are to be received by Owner within <u>one month after the end of</u> each calendar quarter and must show <u>all collectible items</u>. Manager shall furnish reports which contain profit and loss statements and balance sheets on a semi-annual basis, year-to-date. In addition, Manager shall furnish information regarding vacancies and leasing efforts and other matters pertaining to the management, operation, and maintenance of the Project on a quarterly basis.

3.15 <u>Supporting Documentation</u>. As additional support to the quarterly financial statement, Manager shall provide, upon Owner's request, copies of the following:

    (a)  All bank statements, bank deposit slips and bank
reconciliations;

    (b)  Detailed cash receipts and disbursements records;

    (c)  Detailed trial balance;

    (d)  Paid invoices; and

    (e)  Summaries of adjusting journal entries.

    3.16  Budgets.  Annual operating budgets and projected rental rates
for the Project will be approved by Owner.  Manager shall prepare a
recommended operating budget itemizing income and expenses for each
Calendar year beginning during the term of this agreement, and shall
submit the recommended budget to Owner at least sixty days before the
beginning of the fiscal year.  Such budget shall include projected rental
rates sufficient to pay the anticipated expenses including mortgage payments.
Expenses shall be projected on the basis of the current year's increases and
actual costs and with a modest percentage for changes during the course of
the year.

ARTICLE  4
MANAGEMENT AUTHORITY

    4.1  Authority.  Manager's authority is expressly limited to the provisions
contained herein as they may be amended in writing from time to time in accord-
ance with the provisions of this agreement.  Owner expressly withholds from
Manager any power or authority to make any structural change in the Project or
to make any other major alterations or additions in or to the Project or
fixtures or equipment therein, or to incur any expense chargeable to Owner
other than expenses related to exercising the express powers granted to
Manager by the terms of this Agreement without the prior written direction of
Owner.

    4.2  Delegation of Duties.  Manager shall have the right to engage
independent contractors for performance of such of its duties hereunder as
Manager deems necessary, but Manager shall have the responsibility for
supervision of the performance of such duties.

    4.3.  Compliance with Law.  Manager shall use its best efforts to
comply fully with all federal, state, county, municipal and special district
laws, ordinances, rules, regulations and orders relative to the leasing, use,
operation repair and maintenance of the Project.  Manager shall use its best efforts
to remedy promptly any violation of any such law, ordinance, rule, regulation or
other which comes to its attention.  Expenses incurred in remedying violations
may be paid without the prior written approval of Owner, provided such expenses
do not exceed Three Hundred Dollars ($300.00) in any one instance.  When more
than such amount is required or if the violation is one for which Owner might
be subject to penalty, Manager shall notify Owner immediately after Manager
becomes aware of such violation to assure that prompt arrangements may be made
to remedy the violation.

15

**9.3** **Final Accounting.** Upon termination of this Agreement for any reason, Manager shall deliver to Owner immediately upon termination (or upon Manager's subsequent receipt or acquisition) the following with respect to the Project:

> (a) Any tenant security deposits or other monies belonging to Owner held by Manager on Owner's behalf; and

> (b) All records, contracts, leases, receipts for deposits, unpaid bills and other papers or documents in Manager's possession relating to the Project.

## ARTICLE 10
## COOPERATION

If any claims, demands, suits or other legal proceedings which arise out of any of the matters relating to this Agreement be made or instituted by any person against Owner, Manager shall give Owner all pertinent information and reasonable assistance allowable by law in the defense or other disposition thereof, at the sole expense of Owner.

## ARTICLE 11
## CONSENT

Whenever in this Agreement the consent or approval of Manager or Owner is required such consent or approval shall not be unreasonably withheld or delayed. Such consent shall be in writing and shall be duly executed by an authorized Officer or agent for the party granting such consent or approval.

## ARTICLE 12
## NOTICES

All notices, demands, consents and reports provided for in this Agreement shall be given in writing and shall be deemed received by the addressee on the third day after mailing if mailed by United States certified or registered mail, postage prepaid, or on the day delivered if personally delivered at the following addresses:

        If to Owner:        Cathedral Community Services, Inc.
                            10 Concord Avenue
                            Wilmington, DE 19802


        If to Manager:      Capital Management Company
                            300 Cornell Drive, Suite A-5
                            Wilmington, DE 19801

IN WITNESS WHEREOF, the parties have executed this agreement as of the date first above written.

MANAGER          Capital Management Company                 OWNER          Cathedral Community Services,
                 (CAPMANCO)

By: _____                                By: _____
    Property Manager                                            President

                                                           By:_____


Attest_____                             Attest_____

                                                           By:_____


                                                           By:_____


                                                           Attest_____

17

# Capital Management Company

300 CORNELL DRIVE, STE. A-6 • WILMINGTON • DE 19801
PH. 302-426-9850 • FAX 302-426-9787


## PROJECT MANAGEMENT INFORMATION


PROJECT NAME _____

ADDRESS _____
         _____
         _____

NAME OF OWNER _____

ADDRESS _____
         _____
         _____

EMPLOYER ID # _____

PRINCIPLE/DIRECTORS
         _____
         _____
         _____
         _____
         _____
         _____

TOTAL NUMBER OF UNITS _____

UNIT TYPES  1BR
            2BR   _____
            3BR   _____
            4BR   _____

The following addresses represent the units to be managed under
this contract:

| | | |
|---|---|---|
| 2001 N. Market | 1st Floor | 2BR |
| 2001 N. Market | 2nd Floor | 2BR |
| 2001 N. Market | 3rd Floor | 2BR |
| 2005 N. Market | 2nd Floor | 2BR |
| 2005 N. Market | 3rd Floor | 2BR |
| 2007 N. Market | | 1BR |
| 2009 N. Market | | 2BR |
| 2013 N. Market | | 3BR |
| 1 West 20th St. | | Efficiency |

   The following addresses represent the units to be managed under
this contract:

       2001 N. Market       1st Floor       2BR
       2001 N. Market       2nd Floor       2BR
       2001 N. Market       3rd Floor       2BR
       2005 N. Market       2nd Floor       2BR
       2005 N. Market       3rd Floor       2BR
       2007 N. Market                       1BR
       2009 N. Market                       2BR
       2013 N. Market                       3BR
       1 West 20th St.                      Efficiency

*Capital Management Company*

300 CORNELL DRIVE, STE. A-5 • WILMINGTON • DE 19801
PH. 302-426-9850 • FAX 302-426-9787

## PROJECT MANAGEMENT INFORMATION

PROJECT NAME   *Cathedral Community Services*

ADDRESS   *10 Concord Ave*
*Wilmington, DE 19803*

NAME OF OWNER   *Cathedral Community Services, Inc*

ADDRESS   *Same as above*

EMPLOYER ID #

PRINCIPLE/DIRECTORS   *Mrs. Margriet Drane - President*
*Mr. David Frantz - Vice "*

TOTAL NUMBER OF UNITS   *9*

UNIT TYPES 1BR        *1*
          2BR        *6*
          3BR        *1*
          4BR
      *Efficiency*   *1*

Rich Abrams

→ police report inadmissable by statute
cop - only good is next day - people telling him
     was jumping up & down.
3-4 apartments house

→ Management company 1994 contract 1995
Harleysville Ins. Co.

→ ladder blt 9-10 feet    (should've been 13')
→ 3 men hanging around

→ Capital Mgt. took care of the apartment ; $500 limit
* goes on ; can't interrupt
→ Capital Mgt's contract (drew up)

? windows changed
→ new capitol contract in fall of 1999.
→ general inspection clause in 1984 contract.
→ Rebecca's screen popped out 1½ month.

Bernie Conway
  - was master of court
    just below a judge.

Potter – does criminal defense
- receipt of stolen property (found in stolen car)
- probably can get it in.

→ conference w/ Dr Fink Monday P.M.
→ 2 surgeries (2nd cosmetic)
→ some paralysis in ℄ foot
needs brace or cane.
→ ℄ arm just hangs there
→ 3 fingers very strained.

→ I.Q. has improved.   Was high 70s, low 80s
→ barber shop.
→ stepping groups   } planned to start.

→ Brown has a kid to support.
→ mediator abrasive
→ structure guy.

* how firm knows?

Rebecca said 2nd girl friend of Paul's →
3 grup came to her house.

Rich – 10 yrs. 4-5 cases last 2yrs.

Dan – 11yrs. since last May – 1 non-jury ①
                    2nd – settled 3-4th day  3-4 minor cases
                                            just damages.

$430,000 – 3/4 yrs ago.
400 – 500 – 6 yrs. ago,

→ guillotine

~~3 visible scarring.~~

12 jury (unanimous)
          3 or 4 to 6  black
     rest – mostly white female

DuPont
~~retirees~~  → better educated
~~fireds~~       & know numbers.

→ economic damages
→ did Medicaid pay?
       – collateral source rule
no notice of lien

→ pretrial ruling on jury instructions
    on Nuisance aspect // strict liability.
         → guarantees an appeal

piss off jury w/ trespass  notice

**HECKLER & FRABIZZIO**

ATTORNEYS AT LAW

SUITE 1300

MELLON BANK CENTER

919 NORTH MARKET STREET

POST OFFICE BOX 128

WILMINGTON, DELAWARE 19899-0128

GEORGE B. HECKLER, JR.
ANTHONY M. FRABIZZIO
ROBERT H. RICHTER*
MARIA PARIS NEWILL
RICHARD D. ABRAMS
ERIK C. GRANDELL
DANIEL P. BENNETT
WILLIAM D. RIMMER*
JOHN W. MORGAN
TIMOTHY H. ROHS

*DELAWARE AND PENNSYLVANIA BAR

AREA CODE 302
573-4800

———

TELECOPIER
573-4806

January 9, 2001
Refer to: PI99-12838

Re:    **Charles A. Brown v.**
       **Cathedral Community Services, Inc. and**
       **Capital Management Company**
       **Claim No.: 07Z00109**
       <u>**Date of Loss:  8/23/99**</u>

Mr. Mike Lindgren
Senior Claims Supervisor
The Church Insurance Company
445 Fifth Avenue
New York, NY 10016

## LITIGATION PLAN AND BUDGET

Dear Mike:

Pursuant to your request, please allow the following to serve as our updated litigation plan and budget, including an analysis and evaluation as to liability and damages in the above-referenced matter. The analysis and evaluation is based upon the information received to date, the depositions taken in the case, and the written discovery provided by the parties. As more information becomes available in the case, including the receipt of additional medical records, and the depositions of further witnesses, our analysis and evaluation may change.

I.    **Summary of Facts.**

As you are aware, this case arises from an incident occurring at West 20th Street in Wilmington, Delaware on the night of August 24, 1999. Charles Brown, his brother Paul Brown, Marquis Young, and Timothy Wells, were on the sidewalk underneath the second floor apartment of Rebecca King, a/k/a Kidd. Ms. King had been dating Paul Brown and had been in a heated argument with Mr. Brown's current girlfriend on that evening. While attempting to get the attention of Ms. King, apparently, Charles Brown jumped and touched the bottom of the fire escape which is attached to the side of the building. The lower portion of the fire escape is held

25

Mr. Mike Lindgren
January 9, 2001
Page 2

up by a cable and pulley system, with a counterweight which allows the escape to be released to the ground. The lower portion of the fire escape, while in the raised position, usually sets approximately ten feet above the ground. Paul Brown is 6 foot 7 inches tall, and the only one in the group that was able to touch the fire escape. When he did so, the cable snapped and the fire escape released, striking Mr. Brown in the head and shoulders. The counterweight also fell, striking Mr. Brown's face and body. Mr. Brown was taken by ambulance to the emergency room. He was diagnosed with a large right parietal comminuted compound depressed skull fracture with hematoma, and a large scalp laceration. He underwent surgery on August 24, 1999, in order to reduce the depressed skull fracture. He remained in the hospital until September 9, 1999. At that time, he was transferred to Christiana Care Health Services Rehabilitation Unit, where he remained until October 7, 1999. Mr. Brown underwent further surgery by Dr. Boulos on January 12, 2000. A cranioplasty was performed to correct the ten centimeter by five centimeter cranial defect present in the right parietal region.

At the time of the incident, Cathedral Community Services, Inc. ("CCS") was the owner of the property located at West 20th Street. The rental property was managed by co-defendant Capital Management Company ("Capital"). Capital originally entered into an agreement with CCS to manage and maintain CCS' properties in June 1994. By the terms of that agreement, it expired in May 1995. Although no subsequent agreements were ever signed, the parties have continued their relationship to the present. Both defendants were working under the assumption that the general terms of the agreement remained in effect. It was the understanding of the parties that Capital would be responsible for the rental and maintenance of the rental units on the properties. In general, Ray Barto, who was employed by the Cathedral of St. John, but not employed by CCS, would assist in general "handyman" maintenance of the overall properties, as well as retain contractors for substantive exterior repairs of the properties. Mr. Barto left the Cathedral in the Summer of 1999. In the Fall of 1999, Capital began assuming more responsibility for the properties, including the exterior of the properties, and control over the business rentals which were present on the properties. As a result, its compensation was increased. The precise date as to the transfer of responsibilities is unknown because no clear agreement was executed by the parties, although a draft agreement was circulated in November 1999.

II.     **Analysis and Evaluation.**

A.     **Liability.**

Plaintiff has retained an engineering expert who is expected to testify that the cable to the fire escape was in a defective condition in that it was rusty and worn. It is expected that the expert will further testify that it was the defective condition of the cable which caused it to snap when the fire escape was touched by Mr. Brown. It is extremely likely that the cable was in a deteriorated condition and that the cable had not been inspected by anyone for decades prior to the incident. There were not any inspection procedures in place by either CCS or Capital, in the years leading up to the incident. The responsibility for any such inspections is also unclear. Although the agreement entered into in 1994 between Capital and CCS tends to

26

Mr. Mike Lindgren
January 9, 2001
Page 3

place some responsibility upon Capital for the property, the conduct between the parties, as well
as the understanding between the parties, seems to indicate that CCS maintained responsibility
for the exterior portions of the property until late 1999. Moreover, the agreement which was
entered into in June 1994 was theoretically no longer in effect in August 1999, although the
general duties and compensation remained between the parties. Based upon the above, and the
testimony of the various witnesses for the defendants, including Matt Shipp, Gary Hayman,
Robert Chandler and Karen Price, any liability for failure to inspect and maintain the fire escape
will probably rest with CCS.

Additionally, the 1994 agreement entered into between the parties required
CCS to indemnify Capital for any negligence on the part of Capital, unless such negligence was
"gross." Assuming that mere negligence occurred in this instance, and assuming that the terms
and conditions of the agreement were still in effect in 1999, CCS would be required to indemnify
Capital for any liability imposed upon it for negligence. The terms of the agreement would also
require CCS to defend Capital in any such action. As you are aware, Mr. Durstein had provided
several opinions with respect to this issue in November 1999, and we were surprised when
Capital did not request defense and indemnification from CCS.

*REDACTED, 6-3-04*

*966*

27

Mr. Mike Lindgren
January 9, 2001
Page 4

REDACTED, 6-3-04

Mr. Mike Lindgren
January 9, 2001
Page 5

REDACTED; 6-3-04

III.    Litigation Plan.

1.    Depositions of the parties.

As you are aware, the depositions of Gary Hayman, Karen Price and Efron Jorge of Capital; and Matt Shipp and Robert Chandler of CCS, have already been taken. We

Mr. Mike Lindgren
January 9, 2001
Page 6

have provided you with summaries of those depositions. It is anticipated that Mr. Chandler will be re-deposed concerning other issues surrounding the relationship with Capital, and the deposition of Ray Barto will be taken on February 9, 2000. This will conclude the depositions of the parties.

    2.    **Depositions of witnesses.**

*REDACTED, 6-3-04*

As you are aware, trial in the case is scheduled to begin on September 10, 2001. The discovery deadline is July 13, 2001 and any motions for summary judgment must be filed on or before April 18, 2001. It is likely that Capital will file a motion for summary judgment. At that time, we will need to determine whether we have any evidence to keep them in as a defendant.

**IV.**    **Budget.**

30

Mr. Mike Lindgren
January 9, 2001
Page 7

V.    Conclusion.



*REDACTED, 6-3-04*

Thank you for your continued assistance in this matter. If you have any questions, please do not hesitate to contact me.

Very truly yours,

DANIEL P. BENNETT

DPB/amt/50425
cc:    Robert Chandler

31



## MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
A PROFESSIONAL CORPORATION          www.marshalldennehey.com

### 1220 Market Street, Ste. 202, P.O. Box 130, Wilmington, DE 19899

## FACSIMILE TRANSMISSION SHEET

| TO: | COMPANY: | TELEPHONE | FAX NUMBER(S): |
|---|---|---|---|
| Mike Lindgren | The Church Insurance Company | (800) 223-6602 | (212) 779-3766 |
| M. Scott Gemberling, Esq. | MDWC&G/Philadelphia | (215) 575-2714 | (215) 575-0856 |

| | |
|---|---|
| **ATTORNEY:** Tracy A. Burleigh | **NUMBER:** 532 |
| **OUR FILE #:** 13600-00195      **DATE:** 09/06/01 | **ORIGINATOR:** tab |
| **CASE NAME:** Brown v. Cathedral Community Services, Inc. | **CLAIM #:** 07Z00109 |

### NUMBER OF PAGES:   4  (including cover page)

### *IF COPY IS ILLEGIBLE OR INCOMPLETE*
### *PLEASE CALL (302) 552-4300 IMMEDIATELY FOR RETRANSMISSION*

### OUR FAX NUMBER IS: (302) 651-7905
(This space to be used for short or supplemental messages)

Please deliver immediately to the appropriate individual.  Thank you.

### ***CONFIDENTIALITY NOTICE***
The documents accompanying this telecopy transmission contain information from the law firm of Marshall, Dennehey, Warner, Coleman & Goggin which is confidential and/or legally privileged. This information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are hereby notified that you should refrain from reading the contents of the transmission, that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited, and that the documents should be returned to this Firm immediately. In this regard, if you have received this telecopy in error, please notify us by telephone immediately so that we may arrange for the return of the original documents to us.

# MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
A PROFESSIONAL CORPORATION    www.marshalldennehey.com

1220 Market Street, Ste. 202, P.O. Box 130 · Wilmington, DE 19899
(302) 552-4300 · Fax (302) 651-7905

Direct Dial: 302-552-4304
Email: tburleigh@mdwcg.com



September 6, 2001

BY FACSIMILE
Mike Lindgren
Sr. Claims Supervisor
The Church Insurance Company
445 Fifth Avenue
New York, NY 10016

Re:    Brown v. Cathedral Community Services, Inc., et al.
       C.A. No. 99C-10-210 (RRC)
       Claimant: Charles A. Brown
       Insured: Cathedral Community Services, Inc.
       Claim No: 07Z00109
       Date of Loss: 08/23/99
       Our File No: 13600-00195

Dear Mr. Lindgren:

    This will serve as a follow up to our telephone conversation today regarding the above matter. Enclosed please find a copy of a letter which I received today from counsel for Capital Management Company requesting copies of the insurance policies covering Cathedral Community Services, Inc. which were in effect at the time of the original contract (1994) and at the time of the August 23, 1999 accident at issue in this case. As I indicated to you in our telephone conversation, the 1994-95 contract required that Capital Management Company be named as additional insured on all liability insurance policies maintained with respect to the properties identified in the contract. Per your instructions, I did advise Capital's counsel that the management company was not named as an additional insured on any policy covering the subject property at the time of Mr. Brown's accident. I also advised him that the written contract between Cathedral and Capital Management expired in 1995. I received the enclosed letter in response thereto.

    Please provide me with the documentation as requested in the letter or, in the alternative, advise me how you wish to respond to same.

33

Mike Lindgren
September 6, 2001
Page 2

Thank you for your attention to this matter.

Very truly yours,

TRACY A. BURLEIGH

/tab
Enclosure

cc: M. Scott Gemberling, Esquire (via fax)
    (w/enclosure)
\\S_ALLIAB\TYB\STAT\85547\TYB\1360000195

34

# CASARINO, CHRISTMAN & SHALK

**ATTORNEYS AT LAW**
CONECTIV BUILDING
800 NORTH KING STREET
SUITE 200
P.O. BOX 1276
WILMINGTON, DELAWARE 19899

—

(302) 594-4500

STEPHEN P. CASARINO
COLIN M. SHALK
BETH H. CHRISTMAN
DONALD M. RANSOM
KENNETH M. DOSS
DIANE M. WILLETTE
STACEY L. CUMMINGS
THOMAS P. LEFF

TELECOPIER
(302) 594-4509

September 6, 2001

*Via 1-page fax to 651-7905*

Tracy A. Burleigh, Esq.
Marshall, Dennehey, Warner,
        Coleman & Goggin
1220 N. Market Street, Suite 202
P.O. Box 130
Wilmington, DE 19899

Re:   *Charles A. Brown v. Cathedral Community and Capital Management*
      *C.A. No. 99C-10-210-RRC*

Dear Tracy:

        I need to know if Capital Management was a named insured under the policy in effect at the time of the original contract, 1994, and at the time of the accident, August 23, 1999.

        Please send me a copy of those portions of the policies that identify the named insureds. Although Capital Management may not be specifically named, it may be named in general, i.e., general manager.

                        Very truly yours,

                        Stephen P. Casarino

SPC:ted